MONTANA DEPARTMENT OF JUSTICE
Jeremy S. Craft, Agency Legal Counsel
Agency Legal Services Bureau
1712 Ninth Avenue
PO Box 201440
Helena, MT 59620-1440
Phone: (406) 444-7375
Fax: (406) 444-4303
Jeremy.Craft@mt.gov

*Attorney for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| MAKUEEYAPEE D. WHITFORD,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>BRIAN GOOTKIN and JIM SALMONSEN,<br><br>　　　　Defendants. | CV 22-70-H-BMM-JTJ<br><br>DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

Defendants submit this brief in support of their Motion for Summary Judgment. The Court should grant summary judgment to Defendants on Whitford's claims that the Montana State Prison ("MSP") Native American Religious Programming Guidelines (the "Guidelines") impose a substantial burden on the free exercise of his religion because the six months' clear conduct policies therein do not impose a substantial burden on his religious exercise. The Court should

grant summary judgment to Defendants on Whitford's claim that the six months' clear conduct restriction on attending special events imposes a substantial burden on the exercise of his religion because the restriction does not apply to him and is the least restrictive means of implementing a compelling government interest. The Court should grant summary judgment to Defendants on Whitford's claim that the institutional ban on possession of tobacco paraphernalia imposes a substantial burden on the exercise of his religion because it does not actually impose a substantial burden, and even if it did, it is the least restrictive means of enforcing compelling government interests.

## PROCEDURAL HISTORY

Plaintiff Makueeyapee Whitford filed his initial complaint on August 8, 2022.[1] He alleged that an MSP policy requiring inmates to maintain good conduct for six months in order to be eligible to participate in particular ways at some Native American religious ceremonies (the "clear conduct policy") violates the First Amendment to the U.S. Constitution and the Religious Land Use and Incarcerated Persons Act ("RLUIPA") by substantially burdening his right to freely

---

[1] Doc. 2.

exercise his religion.[2] Whitford also alleged that his due process rights were violated in conjunction with a disciplinary hearing.[3] This Court screened out his due process claim on September 1, 2022.[4] Whitford filed an amended complaint on January 9, 2023.[5] His amended complaint does not include a due process claim or a First Amendment claim but retains Whitford's allegations that the MSP clear conduct policies and prohibition on possession of smoking paraphernalia violate his right to freely exercise his religion pursuant to RLUIPA.[6] Whitford asserts six exercises of his religion are prohibited by MSP policy contrary to the requirements of RLUIPA. First, Whitford claims that he must be allowed to stand for election as pipe carrier.[7] Second, Whitford claims he must be allowed to possess and carry his own medicine pipe.[8] Third, Whitford claims he must be allowed to assist in the setup of the sweat lodge for sweat ceremonies.[9] Fourth, Whitford claims that he must be allowed to stand for election as "Road Man.[10]" Fifth, Whitford

---

[2] Doc. 2, pp. 19–27.
[3] Doc. 2, pp. 12–19.
[4] Doc. 8.
[5] Doc. 21.
[6] *See* Doc. 21 *generally.*
[7] Doc. 21, ¶ 22.
[8] Doc. 21, ¶ 22, 24.
[9] Doc. 21, ¶¶ 32–34.
[10] Doc. 21, ¶¶ 32–34.

claims that he must be allowed to participate in drum group practice.[11]

Finally, Whitford claims that he must be allowed to attend the "Annual

Spiritual Gathering, (a/k/a Powwow).[12]" He seeks a declaratory

judgment declaring that the clear conduct policy as applied to specific

religious exercises violates his rights pursuant to RLUIPA;

compensatory damages; punitive damages; injunctive relief enjoining

the application of the clear conduct policy to specific religious exercises;

and injunctive relief compelling a rehearing of a disciplinary infraction

he committed in 2021—or in the alternative, vacating the hearing

decision altogether.[13]

## LEGAL STANDARDS

### 1. Summary Judgment

Summary judgment is appropriate if the moving party "shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."[14] "The moving party initially

bears the burden of proving the absence of a genuine issue of material

---

[11] Doc. 21, ¶¶ 26, 30.
[12] Doc. 21, ¶¶ 20, 36.
[13] Doc. 21, pp. 15–17.
[14] Fed. R. Civ. P. 56(a).

fact."[15] The moving party may meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[16] Thus, "[w]here the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."[17]

After the moving party has met their burden to show there are no genuine issues of material fact, the burden "shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."[18] "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence."[19] The non-moving party "must do more than show there is some 'metaphysical doubt' as to the material facts at issue."[20] Relying on allegations or pleadings is insufficient, and "the non-moving party must come forth with evidence from which a jury could reasonably render a

---

[15] *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
[16] Fed. R. Civ. P. 56(c)(1)(A) & (B).
[17] *Oracle*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325).
[18] *Oracle*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 324).
[19] *Oracle*, 627 F. 3d at 387 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).
[20] *Oracle*, 627 F. 3d at 387 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

verdict in the non-moving party's favor."[21] In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor.[22]

## 2. RLUIPA

RLUIPA provides, in relevant part, "no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability," unless the government establishes that the burden furthers "a compelling government interest," and does so by "the least restrictive means."[23] "While RLUIPA adopts a 'compelling governmental interest' standard, '[c]ontext matters' in the application of that standard."[24] Courts are expected to apply RLUIPA's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."[25]

---

[21] *Oracle*, 627 F. 3d at 387 (citing *Anderson*, 477 U.S. at 252).

[22] *Oracle*, 627 F. 3d at 387.

[23] 42 U.S.C. §§ 2000cc-1(a)(1)–(2).

[24] *Cutter v. Wilkenson*, 544 U.S. 709, 722-23, 125 S. Ct. 2113 (2005) (alteration in original) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S. Ct. 2325 (2003).

[25] *Cutter* at 723 (quoting Cong. Rec. 16698, 16699 (2000) (joint statement of Sen Hatch and Sen. Kennedy on RLUIPA).

The inmate plaintiff bears the initial burden of going forward with evidence to demonstrate a *prima facie* claim that the government policy constitutes a substantial burden on the exercise of his religious beliefs.[26] If the inmate establishes the *prima facie* existence of such a substantial burden, on which he bears the burden of persuasion, the government defendant shall bear the burden of persuasion to prove that any substantial burden on the inmate's exercise of his religious beliefs is *both* "in furtherance of a compelling governmental interest" *and* "the least restrictive means of furthering that compelling governmental interest."[27] RLUIPA is to be construed broadly in favor of protecting an inmate's right to exercise his religious beliefs.[28]

In any RLUIPA claim, the court must begin by identifying the "religious exercise" allegedly impinged upon.[29] Next, the court must ask whether the prison regulation at issue "substantially burdens" that religious exercise.[30]

---

[26] *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).
[27] *Warsoldier*, 418 F.3d at 995 (emphasis in original).
[28] *Warsoldier*, 418 F.3d at 995.
[29] *Greene v. Solano County Jail*, 513 F.3d 982, 987.
[30] *Greene*, 513 F.3d at 987.

A "religious exercise" is "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief."[31]

## A. Substantial Burden

For a land use regulation to impose a substantial burden, it must be oppressive to a significantly great extent.[32] A "substantial burden" on "religious exercise" must impose a significantly great restriction or onus upon such an exercise.[33] A substantial burden occurs where the state denies an important benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.[34]

## B. Compelling Governmental Interest

Prison security is a compelling governmental interest.[35] Whitford concedes as much in his Amended Complaint.[36] Protecting public health and welfare by prohibiting smoking in public places and places of employment is also a compelling government interest.[37]

---

[31] *Greene*, 513 F.3d at 987 (emphasis supplied), quoting 42 U.S.C. § 2000cc-5(7)(A); *Cutter v. Wilkinson*, 544 U.S. 709, 715, 125 S. Ct. 2113 (2005).

[32] *Warsoldier*, 418 F.3d at 995, citing *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).

[33] *San Jose Christian Coll.*, 360 F.3d at 1034.

[34] *Hartmann v. Cal. Dep't of Corr. & Rehab*, 707 F.3d 1114, 1125 (9th Cir. 2013) (citing *Warsoldier*, 418 F.3d 989 at 995).

[35] *Warsoldier.* 418 F.3d at 998, citing *Pell v. Procunier*, 417 U.S. 817, 823, 94 S. Ct. 2800 (1974).

[36] Doc. 21, ¶¶ 41, 53.

[37] *See* Mont. Code Ann. § 50-40-102: "The legislature finds and declares that the purposes of this part are as follows: 1) to protect the public health and welfare by prohibiting smoking in public places and places of

## C. Least Restrictive Means

To prevail upon a RLUIPA claim, in addition to showing that it has a compelling interest, the government must also show that its action was the least restrictive means available to further that compelling interest.[38] Government defendants must show that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice."[39]

## FACTUAL BACKGROUND

The material facts are undisputed. Whitford is an inmate currently incarcerated at MSP.[40] Whitford was sentenced to prison for 60 years after he was convicted of deliberate homicide.[41] On March 16, 2020, Whitford was convicted and sentenced for assaulting MSP staff with bodily fluids.[42] Between 2018 and 2022, Whitford had amassed disciplinary infractions for more than sixteen staff assaults (including the assaults with body fluids), more than fifteen instances of threatening staff, two instances of conspiring or attempting to assault

---

employment; 2) to recognize the right of nonsmokers to breathe smoke-free air; and 3) to recognize that the need to breathe smoke-free air has priority over the desire to smoke."

[38] *Walker v. Beard*, 789 F.3d 1125, 1137 (9th Cir. 2015).

[39] *Warsoldier*, 418 F.3d at 999.

[40] SUF ¶ 1.

[41] SUF ¶ 2.

[42] SUF ¶ 3.

staff, and two instances of possession of a weapon.[43] Since arriving at MSP on November 17, 2016, Whitford had only spent 197 days outside of locked housing, out of 2,323 days total at MSP.[44] One hundred and ninety-four of those were in high security general population; three were in the infirmary.[45] A disciplinary history is filed herewith as Exhibit D.

As of March 29, 2023, Whitford had spent 2,126 days in restrictive housing.[46] At MSP, inmates who present an unusually high security risk are housed in restrictive housing at administrative segregation custody.[47] In restrictive housing, inmates are each housed in separate cells and do not intermingle for activities unless they are secured with restraints or placed in a separate fenced yard.[48] Prior to Whitford's incarceration at MSP, he was incarcerated at  the Crossroads Correctional Center ("CCC") in Shelby, Montana.[49] Whitford was transferred from the CCC to MSP because he stabbed another inmate at

---

[43] SUF ¶ 4.
[44] SUF ¶ 5.
[45] *Id.*
[46] SUF ¶ 6.
[47] *Id.*
[48] *Id.*
[49] SUF ¶ 7.

CCC.[50] Whitford has made threats to stab and otherwise assault MSP staff members.[51]

Until August 16, 2023, Whitford was housed in the Secure Adjustment Unit ("SAU"), which is one of MSP's restrictive housing units.[52] Whitford was housed in the SAU due to his continued assaultive and threatening behavior.[53] The SAU is intended to be temporary housing designed to allow inmates the opportunity to improve their behavior so that they can transition to regular high security housing (high security side general population; herein, "high-side gen. pop.").[54]

MSP is divided into five different compounds: the high security side (the "high side"), the low security side (the "low side"), the Work and Reentry Center (the "WRC"), the Martz Diagnostic Intake Unit ("MDIU"), and Maximum Security ("RHU").[55] On August 16, 2023, Whitford was transferred to high-side gen. pop.[56] Inmates are classified to be housed in one compound or another based on their behavior while

---

[50] *Id.*
[51] SUF ¶ 8.
[52] SUF ¶ 9.
[53] *Id.*
[54] SUF ¶ 10.
[55] SUF ¶ 11.
[56] SUF ¶ 12.

incarcerated, treatment and programming compliance and the severity
and recency of their crimes.[57] Assaultive or predatory behavior
increases the inmate's score.[58] Whitford scores "administrative
segregation custody," i.e., restricted housing, but that classification has
been overridden to "close custody" in high-side gen. pop. because of his
recent satisfactory conduct and completion of the restricted housing
program.[59] Whitford's override to high-side gen. pop. is an opportunity
for him to display good conduct and includes zero tolerance for
assaultive or threatening behavior.[60] Whitford still has a single-cell
restriction, meaning MSP staff consider him still too dangerous to have
a cell mate.[61] Since August 16, 2023, Whitford has accrued five
disciplinary infractions in high-side gen. pop., which indicates that he
remains unable to control his behavior.[62]

Inmates housed on the high side are not permitted on the low side
for any reason.[63] This is due to the more intense security measures
required to safely house high security inmates which are not present on

---

[57] SUF ¶ 13.
[58] SUF ¶ 14.
[59] *Id.*
[60] SUF ¶ 15.
[61] SUF ¶ 16.
[62] SUF ¶ 17.
[63] SUF ¶ 18.

the low side.[64] The security situation is more relaxed on the low side compared to the high side.[65] Inmates housed on the low side enjoy more privileges and opportunities than inmates housed on the high side.[66] Out-of-cell religious activities are available to inmates in high-side gen. pop. as well as inmates in the low security side general population ("low-side gen. pop.").[67] High-side gen. pop. inmates and low-side gen. pop. inmates do not attend the same activities.[68] As Whitford is high-side gen. pop., he is eligible to attend Native American religious ceremonies.[69] These ceremonies include the sweat ceremony, the pipe ceremony, and the talking circle.[70]

Whitford is a member of the Blackfoot Nation and practices the religion of that nation.[71] MSP has a set of guidelines for carrying out Native American religious programming (the "Guidelines").[72] The Guidelines include eligibility for participation in the ceremonies; the selection of the pipe carrier; the selection of the sweat lodge setup crew;

---

[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] SUF ¶ 32.
[68] *Id.*
[69] SUF ¶ 33.
[70] *Id.*
[71] SUF ¶ 29.
[72] SUF, ¶ 30.

operation of the sweat ceremony and pipe ceremony; and drum group practice.[73] Eligibility for election as pipe carrier includes six months' clear conduct,[74] as does eligibility to participate in sweat lodge setup,[75] and eligibility to participate in drum group practice.[76] There is no clear conduct requirement for inmates to participate in the sweat ceremony, pipe ceremony, or the drum circle held in conjunction with the sweat ceremony.[77] The sweat ceremony, pipe ceremony, and drum group practice take place at the RAC.[78] The Guidelines are silent as to a "road man;" it is not a position at MSP Native American religious ceremonies.[79] No inmates are elected to be "road man."[80]

Two sweat ceremonies are held every Saturday at the RAC, weather, security, and other legitimate penological concerns permitting. One week, there is a sweat ceremony for low side units A and B, and a separate sweat ceremony for high side unit ("HSU") 1; the next week,

[73] SUF, ¶ 31.
[74] Exh. A, p. 4, ¶ 6.a.
[75] SUF, ¶ 36.
[76] SUF, ¶ 49.
[77] SUF, ¶¶ 21, 25.
[78] SUF, ¶ 15.
[79] SUF ¶ 38.
[80] *Id.*

there is a sweat ceremony for low side units C and D, and a separate sweat ceremony for HSU 2; then the pattern repeats. [81]

Inmates set up the sweat lodge prior to each ceremony.[82] The sweat lodge setup crew consists of four inmates, plus two alternates. Inmates apply for selection to the setup crew. RAC staff select the setup crew from among the applicants. An inmate must have gone six months without accruing a disciplinary violation to be eligible for selection to the setup crew. This is the "six months' clear conduct requirement." [83]

Two inmates per side are elected by the respective Native American congregation to carry the sacred pipe. There is one pipe carrier for low-side units A and B; one for low-side units C and D; one for HSU-1, and one for HSU-2. The pipe carriers are responsible for mixing the tobacco, bearberries, and red willow for smoking from the sacred pipe.[84] The pipe ceremonies take place in conjunction with the sweat lodge ceremonies; there are also pipe ceremonies separate from the sweat ceremonies. The pipe ceremonies do not require six months' clear conduct to attend.[85] MSP is a smoke-free environment, and as

---

[81] SUF ¶ 34.
[82] SUF ¶ 35.
[83] SUF ¶ 36.
[84] SUF ¶ 41.
[85] *Id.*

such, tobacco is not allowed inside the facility except for at the RAC during pipe ceremonies.[86] Whitford was eligible to attend pipe ceremonies on August 29 and September 12, 2023.[87] Whitford did not attend either pipe ceremony.[88]

There is a drum group which can provide drumming for the sweat ceremonies.[89] Any inmate at a sweat ceremony may join the drum group; drumming at a sweat ceremony does not require six months' clear conduct.[90] The drum group can practice before playing at the sweat ceremonies.[91] Participation in drum group practice requires six months' clear conduct.[92]

Inmates often use the RAC facilities to pass contraband and unauthorized communications among themselves.[93] Preventing the transfer of contraband and unauthorized communications are important institutional security functions.[94] The six months' clear conduct requirements help fulfill these important security functions by

---

[86] SUF ¶ 44.
[87] SUF ¶ 46.
[88] *Id.*
[89] SUF ¶ 47.
[90] *Id.*
[91] SUF ¶ 49.
[92] *Id.*
[93] SUF ¶ 51; *and see* Exhibit F.
[94] SUF ¶ 51.

restricting some religious functions to inmates who have demonstrated their trustworthiness by keeping clear conduct.[95]

Inmate religious congregations may petition to hold special activities on the MSP campus.[96] The Native American low-side gen. pop. congregation has petitioned to hold a powwow as a special activity at MSP.[97] It is likely that the petition will be granted, and there will be a powwow held at MSP in December of 2023.[98] Guests will be invited to the powwow.[99] The last powwow at MSP took place in 2019.[100] A powwow has never been a regularly occurring event at MSP.[101] The powwow will be a low side activity; inmates housed on the high security side of MSP will not be eligible to participate.[102]

MSP Procedure 5.5.101 covers how special activities are put on.[103] A powwow is an "other" type of special activity pursuant to § III.A.2.c.1 of Procedure 5.5.101, and is thus subject to the special activities procedure.[104] Pursuant to Procedure 5.5.101, an inmate must have at

---

[95] SUF ¶ 52.
[96] SUF ¶ 53.
[97] SUF ¶ 54.
[98] *Id.*
[99] *Id., and see* Exh. B, § II. for the definition of "guest."
[100] SUF ¶ 55.
[101] *Id.*
[102] SUF ¶ 56.
[103] SUF ¶ 19.
[104] SUF ¶ 20.

least six months' clear conduct prior to the date of the special activity in order to attend.[105]

The Procedure 5.5.101 clear conduct restriction is in place to prevent inmates who have recently exhibited dubious behavior from attending an event.[106] The restriction was put into place after inmates assaulted other inmates (including sexual assaults), trafficked contraband, and prison gang members planned and carried out assaults at special events.[107] Inmates not normally affiliated with the special activity group were responsible for the assaults and trafficking.[108] These acts disrupted the special events.[109] The clear conduct restriction was put into place to prevent a recurrence of the assaults and trafficking.[110]

Because no high side inmates may attend any activity on the low side, Whitford will not be allowed to attend the powwow, regardless of whether he has six months' clear conduct at the time of the powwow.[111]

---

[105] SUF ¶ 21.
[106] SUF ¶ 22.
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] SUF ¶ 23.

In order for a single high-side inmate to attend the low-side powwow, many extra staff would be required in addition to the extra staff required simply to put on the powwow.[112] The inmate would need an escort of at minimum three correctional officers depending on the total number of inmates attending the powwow.[113] Taking a minimum of three officers from their regular high-side postings would undermine the security of the institution.[114] There are not enough correctional officers to schedule any of them for extra hours; indeed, many of them work significant overtime even in the absence of unusual staffing needs, such as might arise during a special event.[115]

MSP needs to separate certain inmates from other inmates because of a history of assaults, including sexual assaults; threats; or gang affiliations.[116] In many instances, these separation needs are satisfied by moving the threatening or predatory inmate to the high side while leaving the potential or actual victim on the low side.[117]

---

[112] SUF ¶ 24.
[113] *Id.*
[114] SUF ¶ 25.
[115] *Id.*
[116] SUF ¶ 26.
[117] *Id.*

These separation needs would need to be considered in order for a high-side inmate to attend a low-side event.[118]

Special events could—and have—become an opportunity for contraband trafficking.[119] The clear conduct restriction prevents inmates having a recent history of trafficking contraband from gaining access to a wide open market.[120]

In the interest of maintaining institutional security, MSP administrators would probably suspend the powwow entirely because adequately staffing the special event, regular prison operation, and escorts for a high side inmate would be impossible.[121]

MSP inmates are prohibited from smoking and use of tobacco or tobacco substitutes pursuant to MSP Procedure 3.4.3, except as permitted for legitimate inmate spiritual practices such as those set forth in the Guidelines.[122] This prohibition is in accordance with the Montana Clean Indoor Air Act to provide a tobacco-free work and living environment for employees, visitors, and inmates.[123] MSP Procedure

---

[118] *Id.*
[119] SUF ¶ 27.
[120] *Id.*
[121] SUF ¶ 28.
[122] SUF ¶ 58.
[123] *Id.*

3.4.3 prohibits staff, visitors, and inmates from possessing tobacco products and paraphernalia on prison property, except that staff members and visitors may keep tobacco products and paraphernalia in their personal vehicles in the parking lot.[124] Staff members who bring tobacco products on MSP property, other than in personal vehicles or the parking lot are subject to disciplinary action.[125] Visitors who bring tobacco products or paraphernalia into MSP will be terminated from visiting.[126] Smoking accessories such as pipes are contraband at MSP.[127] An inmate allowed to possess a pipe could use the pipe to ingest tobacco or other contraband or allow other inmates to ingest tobacco or other contraband.[128] An inmate could alter a pipe into a weapon or other contraband.[129] Inmates are prohibited from smoking and tobacco use except for legitimate inmate spiritual practices such as the Native American pipe ceremony, which is confined to the RAC.[130]

## ARGUMENT

### A. Election as Pipe Carrier, Participation in Sweat Setup, and Drum Group Practice.

---

[124] SUF ¶ 61.
[125] SUF ¶ 62.
[126] SUF ¶ 63.
[127] SUF ¶ 59.
[128] SUF ¶ 60.
[129] *Id.*
[130] SUF ¶ 64.

Defendants are entitled to summary judgment on Whitford's claims regarding the Native American Religious Programming Guidelines because the six months' clear conduct policy does not constitute a "substantial burden" on Whitford's religious exercise. The clear conduct policy does not prohibit him from participating in the pipe ceremony or the sweat ceremony, or from drumming at the sweat ceremony. The clear conduct policy does not remove any rights from inmates who fail to meet it.

"For a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent. That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."[131] The Supreme Court has found a substantial burden as "where the state … denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."[132]

---

[131] *San Jose Christian Coll.*, 360 F.3d at 1034.
[132] *Thomas v. Review Bd of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18, 101 S. Ct. 1425 (1981) (ruling in First Amendment context).

Defendants do not deny Whitford important benefits because of any conduct he ascribes to his religious belief. Whitford is not on the horns of a dilemma here. Defendants have not put him in a position where he can choose to obey the mandates of his religion and violate MSP rules or comply with MSP rules at the cost of committing heresy. This is readily contrasted with other RLUIPA inmate cases. In *Warsoldier*,[133] prison officials heaped punishments on the plaintiff because he refused to cut his hair to the length allowed by California Department of Corrections rules. 418 F.3d at 991. Warsoldier's religion prohibited him from cutting his hair except upon the death of a close relative. *Id.* In *Shakur v. Schriro*,[134] prison officials provided Shakur, a Muslim, with vegetarian meals instead of more expensive *halal* meals. 514 F.3d at 881–82. According to Shakur, even though the vegetarian meals were technically *halal*, the vegetable protein gave him gas and precluded the state of purity and cleanliness necessary for Muslim prayer. *Id.* at 882. This pressured Shakur to abandon the dietary requirements of his religion. *Id.* at 889. In *Fuqua v. Ryan*,[135] prison

---

[133] 418 F.3d 989 (9th Cir. 2005).
[134] 514 F.3d 878 (9th Cir. 2008).
[135] 890 F.3d 838 (9th Cir. 2018).

officials denied the plaintiff a day off work for observance of a religious holiday, then infracted and fired him for refusing to work on that day in conformity with his religious beliefs. 890 F.3d at 841.

As the foregoing cases demonstrate, RLUIPA protects inmates from receiving punishment for exercising their religion. The clear conduct policy is not punishment at all but is rather an incentive for inmates to demonstrate exemplary behavior. The clear conduct policy does not prevent any MSP inmate from participating in a regular Native American religious ceremony such as the pipe ceremony, the sweat ceremony, and drumming at the sweat ceremony. The clear conduct policy does not allow prison officials to take away any rights upon transgression. Inmates without clear conduct have the right to attend the pipe ceremony and sweat ceremony, and to drum at the sweat ceremony. For those who can meet its requirements, the clear conduct policy provides benefits above and beyond the fundamental right to exercise their religion. RLUIPA does not prohibit such policies.

Whitford cannot show that the clear conduct policy imposes a "substantial burden" on his religious exercise, and therefore, this Court must grant summary judgment to Defendants.

## B.   Powwow Attendance.

Defendants are also entitled to summary judgment on Whitford's claim that the six month's clear conduct restriction in MSP Procedure 5.5.101 imposes a substantial burden on the free exercise of his religion because that section does not apply to him.

A powwow is not a regular religious activity at MSP; accordingly, the Native American Religious Programming Guidelines do not apply. Instead, Procedure 5.5.101 governs a powwow as a special activity. The upcoming powwow at MSP will take place on the low side. Whitford is currently housed on the high side. He cannot attend the upcoming powwow, not because he does not have (or will not have) six months' clear conduct, but rather because he is in high-side gen. pop. and is not allowed on the low side.

Even if Procedure 5.5.101 imposed a substantial burden on Whitford's religious exercise, it presents the least restrictive means of fulfilling the compelling governmental interest in institutional security. If MSP administrators were to consider allowing a high side inmate to attend the low side powwow, the high side inmate would require an escort of a minimum of three correctional officers. MSP is not so effusive

with staff that correctional officers can be pulled from their regular duty stations to provide escort for the duration of the activity. Extra correctional officers will be scheduled to provide security for the powwow even in the absence of a high side inmate, yielding fewer off-duty officers whom MSP could schedule for extra escort duty. Many MSP correctional officers work significant overtime even in the absence of events requiring heightened security, as the powwow will do even without high-side inmates attending. Even having one high side inmate attend the low side powwow would be a significant burden on MSP's staffing capacity. If more high side inmates desired to attend, each would require an escort, multiplying the impact on institutional security.

In the interest of maintaining institutional security, MSP administrators would probably suspend the powwow entirely because adequately staffing the special event, regular prison operations, and escorts for a high side inmate would be impossible. This is a more restrictive means of implementing institutional security than prohibiting high side inmates from attending the powwow.

### C. Possession of a Pipe

Defendants are entitled to summary judgment on Whitford's claims regarding possession of a pipe because the MSP prohibition on pipe possession does not substantially burden his religious exercise, and because prohibiting pipes generally is the least restrictive means of furthering the governmental interest of providing a smoke-free environment to employees and non-smoking inmates. It is also the least restrictive means of furthering the governmental interest in maintaining institutional security.

Restricting pipe possession does not substantially burden Whitford's religious exercise because he may attend and participate in both the pipe ceremony and the sweat ceremony, where he may smoke.[136] Whitford does not allege that this is inadequate.

Even if the restriction did substantially burden his religious exercise, it is the least restrictive means of fulfilling the compelling governmental interest in providing a smoke-free environment to employees, visitors, and other inmates. Restricting pipes removes a ready vehicle for smoking tobacco and other smokable substances. The

---

[136] See, e.g. Jonas v. Schriro, 2006 U.S. Dist. LEXIS 69427 at *13–15 (D. Ariz., September 25, 2006), finding no RLUIPA violation where, "…[w]hile Plaintiff's ability to practice [pipe and smudging] ceremonies is limited, he is not prohibited from engaging in them."

restriction makes it more difficult for an inmate to surreptitiously smoke when that inmate would have to obtain not only the smokable substance but also a vehicle for ingesting the smoke. In the absence of the restriction, an inmate desiring to smoke would have to obtain only a smokable substance in order to surreptitiously indulge and thereby deprive MSP employees, visitors, and other inmates of the smoke-free environment to which they are entitled.

The restriction is also the least restrictive means of fulfilling the compelling government interest in maintaining institutional security. Not only might a pipe be used for its intended use as a method of ingesting tobacco and other smokable substances, but it might also be sharpened and used as a weapon or other contraband, or as a commodity in trade. There is no less restrictive means of maintaining institutional security against such uses other than a complete ban on possession.

## CONCLUSION

The Court should grant Defendants' motion for summary judgment. The Guidelines do not impose a substantial burden on Whitford's exercises of religion because he can participate in the pipe

and sweat ceremonies. The six months' clear conduct provision of Procedure 5.5.101 does not impose a substantial burden on Whitford's exercise of religion because it does not apply to him. The prohibition on possession of pipes does not impose a substantial burden on Whitford's exercise of religion because he can participate in the pipe ceremonies; moreover, the prohibition is the least restrictive means of fulfilling the compelling governmental interests of providing employees, visitors, and other inmates with a smoke-free facility and maintaining institutional security.

DATED this 22nd day of September 2023.

AGENCY LEGAL SERVICES BUREAU

*/s/ Jeremy S. Craft*
JEREMY S. CRAFT
Agency Legal Counsel

CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and quoted and indented material; and the word count calculated by Microsoft Word for Windows is 5,291 words, excluding the caption, certificates of compliance and service, and if required, any tables of contents and authorities, and exhibit list.

/s/ Jeremy S. Craft
JEREMY S. CRAFT
Agency Legal Counsel

CERTIFICATE OF SERVICE

I certify that on September 22, 2023, I electronically filed the foregoing document with the clerk of the court for the United States District Court for the District of Montana, using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that on September 22, 2023, I caused a copy of the foregoing document to be served by first class mail to:

Makueeyapee D. Whitford, #3015941
Montana State Prison
700 Conley Lake Road
Deer Lodge, MT 59722


*/s/ Jeremy S. Craft*
JEREMY S. CRAFT
Agency Legal Counsel